**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| ANGELA HUDSON, o/b/o | ) |
| BARBARA ANN HUDSON, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|     vs. | )     **Case number 4:13cv1076 TCM** |
| | ) |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
|     Defendant. | ) |

## MEMORANDUM AND ORDER

This action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final

decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner),

denying the applications of Barbara Ann Hudson (Plaintiff) for disability insurance benefits

("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. § 401-433, and for

supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381-1383b,

is before the undersigned by written consent of the parties.[1]  See 28 U.S.C § 636(c).

## Procedural History

Plaintiff applied for DIB and SSI in July 2011, alleging she was disabled as of October

1, 2010, because of depression, learning disabilities, low intelligence quotient ("IQ"), anxiety

disorder, memory loss, bipolar disorder, and right knee pain and immobility.  (R.[2] at 132-46,

---

[1]The complaint is filed by Angela Hudson on behalf of her deceased mother, Barbara Ann
Hudson, the claimant.  For ease of reference, Barbara Hudson shall be referred to as the plaintiff.

[2]References to "R." are to the administrative record filed by the Commissioner with her
answer.

164.)  After the initial denial of her applications, a hearing was held in January 2013 before Administrative Law Judge ("ALJ") Amy Klingemann.  (Id. at 32-76, 79-83, 81-87.)  By decision rendered March 1, 2013, the ALJ held that Plaintiff was not disabled before February 1, 2013, but was thereafter.[3]  (Id. at 13-15, 17-27.)  The Appeals Council initially denied Plaintiff's request for review.  (Id. at 5-7.)  The Appeals Council then set aside that denial, considered unspecified additional information, and again denied review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 1-3.)

### Testimony Before the ALJ

Plaintiff, represented by counsel, and Dale A. Thomas, C.R.C.,[4] testified at the administrative hearing.

Plaintiff was fifty-four years old at the time of the hearing.  (Id. at 42.)  She was 5 feet 2.5 inches tall and weighed 146 pounds.  (Id. at 42-43.)  She finished the eleventh grade; failed the twelfth grade; and got a General Equivalency Degree ("GED").  (Id. at 43)  She also finished a medical computer secretary course.  (Id.)  At the time of the hearing, she was working two to six hours a week cleaning house for three elderly clients.  (Id. at 44.)  This job entailed vacuuming, mopping, cooking a meal if they needed one, cleaning the bathroom, and doing their laundry.  (Id.)

She worked for the City of St. Louis from 1997 to 2005 or 2006.  (Id. at 46, 48, 49.)

---

[3]The Court notes that the complaint alleges that Plaintiff died on March 2, 2013.  (Compl. ¶ 2.)

[4]"C.R.C." is a Certified Rehabilitation Counselor.

Asked what prevents her from currently working full-time, Plaintiff explained that she does not have the energy to do so and that no one will hire her. (Id. at 49.) Her hips have started to bother her. (Id. at 50-51.) Although she is taking medications, she has crying spells. (Id. at 52.) She has trouble with her memory. (Id.) She has trouble with people "when they don't treat [her] equally." (Id. at 53.) Depression, anxiety, and attention deficit disorder also prevent her from working full time. (Id. at 62.)

On a typical day, Plaintiff gets up, takes her medicine, goes to a client's home if she is scheduled to and cleans, comes home, takes a nap, and then, when the person she lives with comes home, makes dinner. (Id. at 54.) She does not have any hobbies. (Id.) She has two cats; she helps the person she lives with take care of them. (Id. at 54-55)

Plaintiff also testified that she had been physically abused by her ex-husband. (Id. at 58.) She thinks of suicide at least every other day. (Id. at 59.)

Mr. Thomas, testifying without objection as a vocational expert ("VE"), characterized Plaintiff's job cleaning houses as a general house worker, defined in the *Dictionary of Occupational Titles* ("DOT"), 301.474-010, as medium and semiskilled. (Id. at 64-65.) Her job as an officer worker, DOT 219.362-010, is light and semi-skilled. (Id. at 65.) Her job as a personal care aide, 354.377-014, is medium and semi-skilled as defined in the DOT and light as she performed it. (Id.)

He was then asked to assume a hypothetical claimant of Plaintiff's age, education, and past work experience who can perform repetitive tasks and is limited to occasional interaction with supervisors and coworkers and to no interaction with the public. (Id. at 66.) Mr.

Thomas testified that this person cannot perform Plaintiff's past jobs but can perform other jobs. (Id. at 66-67.) For instance, she can work as a bench assembler or packer. (Id.) These jobs can also be performed by a hypothetical claimant who can handle only occasional changes in the workplace. (Id. at 67.) If one day a week the hypothetical claimant would be absent from work or have to leave work, no jobs would be available. (Id. at 68.)

**Medical and Other Records Before the ALJ**

The documentary record before the ALJ included forms completed as part of the application process, documents generated pursuant to Plaintiff's applications, records from health care providers, and assessments of her physical and mental abilities.

When applying for DIB and SSI, Plaintiff completed a Disability Report, disclosing that she had stopped working in October 2010 because of her condition. (Id. at 165.) Her current medications included Ability (for anxiety and depression), Synthroid (for hypothyroidism), warfarin (to prevent blood clots), and Wellbutrin (for depression). (Id. at 167.)

Plaintiff also completed a Function Report. (Id. at 171-78.) Asked to describe what she does during the day, she replied that she eats breakfast, takes medications, reads, rests, eats lunch, rests, prepares and eats supper, reads, rests, watches a television show, and goes to bed. (Id. at 171.) She does word searches. (Id.) She lives in a house with a friend. (Id.) She does not have any problems taking care of her personal needs, but does take a sleeping pill every night. (Id. at 172.) Before her impairments, she could operate a computer, clean a house, and be taught. (Id.) She does one load of laundry a week and one cleaning chore

a day.  (Id. at 173.)  This takes her fifteen minutes a day.  (Id.)  Twice a month for no longer than an hour, she shops for groceries.  (Id. at 174.)  She attends church twice a week and talks on the telephone with friends daily.  (Id. at 175.)  Because of her impairments, she cries easily.  (Id. at 176.)  Her impairments adversely affect her abilities to squat, bend, stand, walk, kneel, talk, hear, remember, understand, concentrate, climb stairs, complete tasks, follow instructions, and get along with others.  (Id.)  She cannot pay attention for longer than three minutes and seldom finishes what she starts.  (Id.)  She cannot walk for longer than fifteen minutes before becoming short of breath.  (Id.)  She cannot follow written or spoken instructions well.  (Id.)  She does not handle stress or changes in routine well.  (Id. at 177.)

A friend completed a Function Report on Plaintiff's behalf.  (Id. at 189-96.)  Her answers generally mirrored Plaintiff's with the exceptions of listing only seven abilities adversely affected by her impairments, i.e., understanding, bending, remembering, concentrating, following instructions, completing tasks, and getting along with others, and with describing how well Plaintiff handles changes in routine as "pretty good."  (Id.)

On a Work History Report, Plaintiff named a clerk/typist job as the job she had held the longest.  (Id. at 182.)  In that job, the heaviest weight she occasionally lifted was fifty pounds; the heaviest weight she frequently lifted was twenty-five pounds.  (Id. at 187.)  She walked or stood for a total of three hours each.  (Id.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of her application, reporting that her short-term memory and social anxiety were worse.  (Id. at 197-

201.) In addition to her other medications, she was taking temazepam to help her sleep. (Id. at 199.)

The relevant medical records before the ALJ are summarized below in chronological order and begin in February 2010 when Plaintiff went to the emergency room at Mercy Hospital with complaints of moderate left arm pain that had started twelve to twenty-four hours earlier. (Id. at 523-45.) On examination, a review of her systems, including psychiatric, were negative with the exception of "very minimal swelling (if any) of left arm.". (Id. at 523, 525-26, 532-33.) Chest x-rays were negative. (Id. at 539.) A doppler study was done to rule out deep venous thrombosis; it did. (Id. at 538, 539-40.) Plaintiff's dosage of Coumadin (the brand name for warfarin) was adjusted and she was discharged. (Id.)

Plaintiff returned to the emergency room on March 3 for complaints of chest pain. (Id. at 546-66.) She was "on chronic long-term anticoagulation" medication and had stopped taking it one week earlier in anticipation of upcoming surgery. (Id. at 546.) Several times a day since then, she had been having pain that radiated to her back between her shoulder blades. (Id.) On examination, a review of her systems was negative, including psychiatric, neurological, and musculoskeletal. (Id. at 548-49, 554-55.) It was noted that she had no left arm pain or swelling. (Id. at 552.) A computed tomography ("CT") angiogram of her chest was negative for pulmonary emboli. (Id. at 550, 556, 563.) An stress echocardiogram was negative for ischemia. (Id. at 556, 558-59.) Plaintiff reportedly was having second thoughts about the surgery and was instructed to talk with her surgeon. (Id. at 556.) She was stable and asymptomatic, and was discharged home. (Id. at 562.)

Five days later, Plaintiff was admitted to Mercy Hospital for gynecologic surgery. (Id. at 567-74.) She was discharged the next day. (Id. at 571.)

In September, Plaintiff was taken by ambulance to the emergency room at Mercy Hospital for complaints of pain in her right shoulder blade that was worse when she turned her head from side to side or when she moved her right arm. (Id. at 477-98.) It was noted that she had a history of lymphoma, now in remission, that had presented with similar pain. (Id. at 478, 479.) On examination, a review of her symptoms, including psychiatric and pulmonary, was negative with the exception of the upper back pain behind her right shoulder blade. (Id. at 479, 481-82.) Her current medications included Wellbutrin, hydrocodone-acetaminophen (a generic form of Norco), Synthroid, Zofran (to be taken as needed for nausea), and warfarin. (Id. at 477-78, 480-81.) A CT angiogram of her chest showed no evidence of pulmonary emboli. (Id. at 486.) It also revealed advanced underlying emphysema, mild dependent atelectasis, and a small left upper lobe and lower lobe pulmonary nodule unchanged from six months earlier. (Id.) It was recommended she have a follow-up CT in one year "to confirm continued stability." (Id.) She was diagnosed with thoracic sprain and strain and prescribed Flexeril, a muscle relaxant, to be taken at night as needed for pain. (Id. at 478, 480, 484, 495.) She was also to take Tylenol during the day as needed for pain. (Id. at 478.) If her symptoms did not improve, she was to call her primary care physician. (Id. at 478, 484.) If they worsened, she was to return to the emergency room. (Id.)

In October, Plaintiff was voluntarily admitted to Mercy Hospital after finding out that her mother was giving her IV-drug-abusing daughter needles. (Id. at 575-88.) She wished

to be evaluated for suicidal risk, but had no current suicidal ideation, plan, or intent. (Id. at 575.) She reported that she told people whose houses she cleans about her personal problems and her daughter's drug use; she thought this behavior was hurting her business. (Id.) On examination, her mood was depressed; her affect was constricted; her thought processes were within normal limits; her insight and judgment were limited; her speech was normal in pitch and volume. (Id. at 576.) She was diagnosed with major depressive disorder, recurrent. (Id.) Her current Global Assessment of Functioning ("GAF") was 50[5]; her GAF in the past year was 65.[6] (Id. at 577.) Her Wellbutrin dosage was doubled. (Id.) "[She] was treated with individual psychotherapy, group therapy, and inpatient milieu." (Id. at 584.) She responded well. (Id.) On discharge two days after admission, Plaintiff had a good mood, appropriate affect, and good insight and judgment. (Id.) Her current GAF was 65. (Id. at 583.) She was to follow up with Dr. Garcia-Ferrer, who had treated her during her hospitalization, in one week. (Id. at 585.)

---

[5]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000) [DSM-IV-TR], the [GAF] Scale is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003) (quoting DSM-IV-TR at 34), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010). A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34 (emphasis omitted).

[6]A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34 (emphasis omitted).

Plaintiff did not follow up with Eduardo L. Garcia-Ferrer, M.D., at the John F. Kennedy Clinic at St. Louis Mercy Medical Center (JFK Clinic) until January 2011 and it was then for a refill of her psychiatric medications. (Id. at 262-69.) Her diagnoses included chronic hypothyroidism, thromboembolism, cystocele, pain and swelling in the left arm, chronic deep vein thrombosis in her upper extremity, hyponanemia, potassium depletion, chronic depression, chest pain, and major depressive disorder, recurrent episodes, moderate, in partial remission. (Id. at 262, 265.) Plaintiff reported that her relationship with her daughter was better. (Id. at 264.) Her occasional crying spells were for "happy things." (Id.) On examination, Plaintiff had a euthymic mood, normal affect and thought process, appropriate thought content, fair insight and judgment, and "grossly intact" cognition. (Id.) Her speech was normal in pitch and volume. (Id.) Her medications, bupropion (the generic form of Wellbutrin) and temazepam (the generic form of Restoril), were continued. (Id. at 265, 266.) Synthroid and warfarin were discontinued. (Id. at 266.)

In April, Plaintiff returned to the JFK Psychiatric Clinic. (Id. at 270-77.) On examination, Plaintiff was as before; her two psychiatric medications were renewed. (Id. at 272-73.)

On July 1, Plaintiff was admitted to Mercy Hospital from the emergency room after she went there with complaints of being depressed. (Id. at 589-605.) She had had an acute onset of feelings of hopelessness and helplessness because she could not save her daughter. (Id. at 595, 602.) She also had severe anxiety symptoms and crying spells triggered by her daughter's heroin problems, problems that Plaintiff thought were in remission. (Id.) It was

noted that in addition to seeing Dr. Garcia-Ferrer, Plaintiff was seeing a counselor, Katie Bollinger. (Id. at 595.) On examination, Plaintiff was dressed and groomed appropriately and lacked psychomotor agitation or retardation. (Id. at 596.) She spoke with a regular rate and rhythm and "[d]escribe[d] her mood as 'anxious.'" (Id.) Her affect was labile; her thought process was goal-directed and linear; her thought content was negative for psychotic symptoms. (Id.) Plaintiff was given support, reassurance, coping mechanisms, and problem solving techniques and was discharged two days later. (Id. at 596, 603.) Her diagnosis was mood disorder, not otherwise specified, versus major depression. (Id. at 596.) Her current GAF was 55-60. (Id. at 603.) Her current medications included Wellbutrin, Coumadin, temazepam, albuterol, and Synthroid. (Id.) She was to continue treatment with Dr. Garcia-Ferrer and counseling with Ms. Bollinger. (Id.)

Plaintiff saw Dr. Garica-Ferrer on July 11, reporting that she was feeling very stressed. (Id. at 281-86.) She was having "numerous unrealistic fears," e.g., she thought her boyfriend might try to kill her. (Id. at 281.) On examination, she had an anxious and depressed mood, a constricted affect, and limited insight and judgment. (Id. at 282.) She was prescribed Ability to help with her depression and delusions. (Id.) She was to return in two weeks. (Id.)

In August, Plaintiff was seen at the JFK Internal Medicine Clinic for neck and back pain that had begun that morning when she woke up. (Id. at 287-301.) The pain was "dull and achy" and was a four on ten-point scale. (Id. at 290.) She could not recall any injury or other cause of the pain. (Id.) She also wanted her psychiatric medications refilled, but it was explained to her that they did not do so at that clinic. (Id.) She was diagnosed with

musculoskeletal pain, probably from sleeping oddly; instructed to take Tylenol (she declined Flexeril); given handouts on home exercises; and told to call if the pain did not improve in one week.  (Id. at 291, 293-99.)

In October, three months after last seeing Dr. Garcia-Ferrer, Plaintiff returned for a follow-up appointment.  (Id. at 302-10.)  She was doing well and applying for disability.  (Id. at 304.)  As before, she had no suicidal or homicidal ideations and no delusions or hallucinations.  (Id.)  Her speech was normal in pitch and volume; her mood was euthymic; her affect and thought process were normal; her thought content was appropriate; her insight and judgment were fair.  (Id. at 305.)  She did not feel depressed or hopeless.  (Id. at 307.)  She was prescribed aripiprazole (the generic form of Abilify), temazepam, and bupropion.  (Id. at 305.)  She was to return in three months.  (Id.)

Plaintiff was seen in December at the JFK Internal Medicine Clinic for an examination of her right ankle.  (Id. at 311-23, 462.)  Plaintiff explained that she had injured the ankle two years earlier when falling.  (Id. at 316.)  Because she did not then have money or insurance, she ignored the pain.  (Id.)  It had been aching intermittently since, particularly when it rained.  (Id.)  She walked okay.  (Id.)  Also, she reported feeling depressed and hopeless.  (Id. at 318.)  X-rays revealed no acute bony abnormalities.  (Id. at 311.)

On January 3, 2012, Plaintiff returned to the JFK Internal Medicine Clinic.  (Id. at 324-34.)  Plaintiff reported that her depression – caused by concern about her daughter's use of illegal drugs – had improved on Abilify and Wellbutrin, but she was worried that her recent weight gain and lightheadedness was caused by the Abilify.  (Id. at 327.)  Her anxiety and

fear while driving or being at home alone had increased. (Id.) Her confusion and memory deterioration had also increased, which she attributed to the temazepam. (Id.) On examination, Plaintiff was nervous and anxious, but not depressed. (Id.) She reported feeling depressed and hopeless. (Id. at 330.) She had a "[s]omewhat slowed response, subjective poor memory." (Id. at 328.) She was diagnosed with hyperlipidemnia and told to take Lipitor. (Id.) She could stop taking the temazepam, but was to speak with Dr. Garcia-Ferrer before stopping the Abilify. (Id.)

Twenty days later, Plaintiff saw Dr. Garcia-Ferrer, reporting that she had gained thirty pounds since July and attributed the gain to Abilify. (Id. at 335-44.) On examination, Plaintiff had a euthymic mood, normal affect and thought process, appropriate thought content, fair insight and judgment, and "grossly intact" cognition. (Id. at 339.) Her speech was normal in pitch and volume. (Id.) Dr. Garcia-Ferrer discussed with Plaintiff the risks of stopping Abilify; Plaintiff wished to take those risks. (Id.) She was to return in three months. (Id. at 342.)

In February, Plaintiff had an annual examination at the JFK Internal Medicine Clinic. (Id. at 345-55.) She had no complaints. (Id.) She did not feel depressed or hopeless. (Id. at 351.) She was to return in one year or as needed. (Id. at 350.)

In April, Plaintiff informed Dr. Garcia-Ferrer that her sex drive had increased since she stopped taking the Abilify. (Id. at 356-65.) Her concentration was reduced. (Id. at 359.) On examination, her mood was anxious and depressed; her affect was constricted; her insight

and judgment were limited.  (Id.)  She was prescribed Seroquel, an antipsychotic medication.  (Id. at 360.)  She was to return in one month.  (Id. at 363.)

On May 1, Plaintiff was seen at the JFK Internal Medicine Clinic for a refill of her medications.  (Id. at 366-76.)  She had stopped taking Seroquel on her own.  (Id. at 369, 370.)  Her mood was good; however, she still had "significant stress."  (Id. at 369.)  She attributed the stress to "liv[ing] day to day" and not having any savings.  (Id.)  She was trying to get on disability.  (Id.)  She had not been taking Lipitor.  (Id.)  She had had some reflux at night, and took Tums for relief.  (Id.)  Sometimes, it did not work.  (Id.)  On examination, she was not nervous or anxious.  (Id.)  She was encouraged to take the Lipitor.  (Id.)  She was also prescribed Synthroid for her hypothyroidism and Prilosec for her reflux problems.  (Id. at 370, 374.)  She was to return to the Internal Medicine Clinic in four months.  (Id. at 374.)

Plaintiff was seen by Dr. Garcia-Ferrer on May 21.  (Id. at 377-86.)  She reported that she had taken the Seroquel for only one day because it caused restless legs.  (Id. at 380.)  He described her as "quite somatic."  (Id.)  She had headaches – the current one was a six – and other physical complaints and could not make decisions.  (Id. at 380, 382.)  On examination, her mood was anxious; her concentration, affect, and thought process were normal; her insight and judgment were limited; her thought content was appropriate; and her speech was normal in pitch and volume.  (Id. at 381.)  She did not feel depressed or hopeless, but did have little interest in doing things.  (Id. at 383.)  She was prescribed Wellbutrin and Restoril and was to return in one month.  (Id. at 383, 385.)

Plaintiff was seen at the JFK Internal Medicine Clinic in July for complaints of urinary frequency and pain and mild left-sided back pain. (Id. at 387-98, 463.) She was diagnosed with a lower urinary tract infection and prescribed an antibiotic to be taken for five days. (Id. at 392.) She returned six days later with complaints of blood in her urine and urinary pain. (Id. at 399-405.) She was referred to the Urology Clinic. (Id. at 403.)

Plaintiff reported to Dr. Garcia-Ferrer in August that she did not feel depressed and disclosed that she did not always take the Wellbutrin. (Id. at 406-14.) "She [was] working but considering taking disability." (Id.) The boyfriend she lived with wanted her to. (Id.) On examination, Plaintiff had a euthymic mood, normal affect and thought process, appropriate thought content, and fair insight and judgment. (Id. at 409.) Her prescriptions for Restoril and Wellbutrin were renewed. (Id. at 411.) She was to return in three months. (Id. at 413.)

Plaintiff did. (Id. at 415-23.) On examination, she was as she had been in August. (Id. at 418.) She reported that she tended to be forgetful. (Id. at 417.) Although this was not new, it was worse. (Id.) Her medications were renewed. (Id. at 420.) As before, Plaintiff was to return in three months. (Id. at 422.)

The same month, Plaintiff was seen at the JFK Internal Medicine Clinic for complaints of nasal congestion and coughing. (Id. at 424-34.) She was diagnosed with acute bronchitis and prescribed an antibiotic, Zithromax. (Id. at 428, 430.)

On December 3, Plaintiff drove herself to the emergency room at Mercy Hospital for complaints of back pain for the past four weeks and resulting difficulties using her left upper

extremity. (Id. at 499-522.) She had not tried anything to relieve the pain. (Id. at 501.) A review of her symptoms, including psychiatric, was negative except for the back pain. (Id. at 501, 504.) She had a normal range of motion in her musculoskeletal system. (Id. at 504.) X-rays of her chest showed no active pulmonary disease and were unremarkable. (Id. at 509.) She was diagnosed with back pain. (Id. at 506, 518.) On discharge, she was instructed to take two puffs of albuterol every six hours as needed for shortness of breath and hydrocodone-acetaminophen every six hours as needed for pain. (Id. at 499, 519.) She was to continue taking her current medications of Lipitor, Zithromax, Wellbutrin, Synthroid, Restoril, and warfarin. (Id. at 500, 519-20.) She was also currently using a nicotine patch to try to stop smoking.[7] (Id.)

Two days later, Plaintiff reported to the providers at the JFK Internal Medicine Clinic that the antibiotics had cleared up most, but not all, her cough. (Id. at 435-45.) She had pain in her left shoulder blade and was also concerned about a changing skin lesion. (Id. at 438.) She was diagnosed with a moderate infraspinatus sprain and prescribed Aleve and Flexeril. (Id. at 440.) The lesion was to biopsied. (Id.)

Plaintiff returned to the clinic three days later, stating that she thought the back pain was due to a twisting injury she had sustained two weeks earlier. (Id. at 447-60.) On examination, the pain could not be reproduced. (Id. at 451.) She had a normal range of motion in her left shoulder. (Id.) She also had a normal mood and affect. (Id.) She was

---

[7]There are repeated references in the record to Plaintiff having a forty-year history of smoking one pack of cigarettes a day. (See e.g. id. at 318.)

- 15 -

diagnosed with back pain, given home exercises, and told to take only Motrin for a week. (Id. at 452, 456-59.)

Plaintiff underwent several diagnostic tests on January 29, 30, and February 1, 2013. (Id. at 606-09.) A magnetic resonance imaging ("MRI") of her lumbar spine revealed "marrow lesions worrisome for lymphoma given the history." (Id. at 609.) She was diagnosed with lymphoma with metastasis to the spinal cord. (Id.) An MRI of her hip revealed "[s]cattered, destructive masslike lesions throughout the pelvis compatible with metastatic disease and/or lymphoma." (Id. at 608.) An MRI of her brain revealed an "enhancing lesion in the left frontal calvaria" and a "nodule of enhancement to the falx on the right in the frontal region." (Id. at 607.) Later in February, she was put in hospice care. (Id. at 224.)

Also before the ALJ were assessments of Plaintiff's mental and physical impairments and their resulting limitations.

In October 2011, Plaintiff underwent a psychological evaluation by Shannon D. N. Davis, Ph.D., a licensed psychologist. (Id. at 227-30.) Plaintiff reported having a nervous breakdown when she was seventeen years old, for which she was hospitalized; another when she was married, for which she was again hospitalized; and a third in 1980. (Id. at 227.) She had inpatient psychiatric treatment for two to three days in October 2010 and was put on Wellbutrin and Abilify. (Id. at 227-28.) She reported that her symptoms were "relatively well-controlled with her current medication regimen." (Id. at 228.) She had been physically abused by her step-father and sexually abused by a neighbor. (Id.) On examination, she had

a cooperative attitude, alert expression, good eye contact, euthymic mood and affect, good memory, and a normal rate and rhythm of speech. (Id. at 229.) Her posture and gait were within normal limits. (Id.) Her thought content "was somewhat tangential and circumstantial," but did not include delusions, hallucinations, or suicidal or homicidal ideation. (Id.) She reported that she got along "adequately with others." (Id. at 230.) She demonstrated "the ability to maintain adequate attention and concentration with appropriate persistence and pace." (Id.) She was diagnosed with generalized anxiety disorder and depressive disorder, not otherwise specified. (Id.) Her GAF was 65. (Id.) Dr. Davis opined that Plaintiff did not have bipolar disorder. (Id.)

The same day, Plaintiff had a physical evaluation by Yasuo Ishida, M.D. (Id. at 233-38.) Plaintiff reported that she did not take any medication. (Id. at 233-34.) She complained of right knee pain caused by cleaning houses; she wore a knee brace. (Id. at 233.) The knee pain was improving. (Id. at 234.) She smoked one pack of cigarettes a day. (Id.) The examination findings were generally normal, including a normal gait and no difficulties getting on and off the examination table and moving around the room. (Id. at 234-35.) Her right knee pain was not present. (Id. at 235.) Plaintiff reported that it was getting better. (Id.) She had a full range of motion in her shoulders, elbows, wrists, knees, hips, ankles, and back. (Id. at 237-38.)

The same month, a Psychiatric Review Technique form was completed for Plaintiff by a non-examining consultant, Kyle DeVore, Ph.D. (Id. at 240-72.) She was described as having an affective disorder, i.e., depressive disorder, and an anxiety-related disorder, i.e,

generalized anxiety disorder.  (Id. at 240, 243, 244.)   The boxes to be marked if the impairments were not severe or, if severe, were not expected to last twelve months were not checked.  (Id. at 240.) Her disorders resulted in no restrictions in her activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  (Id. at 248.)  They did not cause repeated episodes of decompensation of extended duration.  (Id.)

On a Mental Residual Functional Capacity Assessment form, Dr. DeVore assessed Plaintiff as being moderately limited in one of the three abilities in the area of understanding and memory, i.e., understanding and remembering detailed instructions, and not significantly limited in the other two.  (Id. at 251.)  In the area of sustained concentration and persistence, Plaintiff was moderately limited in one of the eight listed abilities, i.e., the ability to carry out detailed instructions.  (Id. at 251-52.)  She was not significantly limited in the other seven abilities.  (Id.)  In the area of social interaction, Plaintiff was moderately limited in one of the five listed abilities, i.e., the ability to accept instructions and respond appropriately to criticism from supervisors, and was not significantly limited in the other four abilities.  (Id. at 252.)  In the area of adaptation, she was not significantly limited in three of the four abilities and was moderately limited in her ability to respond appropriately to changes in the work setting.  (Id.)

**The ALJ's Decision**

The ALJ first determined that Plaintiff met the insured status requirement of the Act through December 31, 2015, and had not engaged in substantial gainful activity since her

alleged onset date. (Id. at 19.) Although she had worked after that date, the work did not rise to the required level. (Id.)

The ALJ next found that, as of October 1, 2010, Plaintiff had a severe impairment of status post lymphoma. (Id.) As of February 1, 2013, she had recurrent lymphoma. (Id.) The ALJ determined that Plaintiff's mental impairment of depression and/or anxiety was not a severe impairment as it did not cause more than minimal limitations in her ability to perform basic mental activities. (Id. at 20.) The records indicated mild symptoms which "are controllable" with medication. (Id.) She had no history of psychiatric treatment. (Id.) And, the only mental limitation she described at the hearing was fatigue. (Id.) Addressing the four functional areas, the ALJ found she had mild limitations in her activities of daily living, in social functioning, and in concentration, persistence, or pace. (Id.) She has not had any episodes of decompensation of extended duration. (Id.)

The ALJ next determined that, prior to February 1, 2013, Plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment of listing-level severity. (Id. at 21.) Prior to that date, she had the residual functional capacity ("RFC") to perform the full range of light work. (Id.) The ALJ noted that there was no evidence to support Plaintiff's claim of a low IQ and learning disability. (Id. at 22.) She had been able to work successfully for many years after being treated for lymphoma in 1989. (Id.) She had been treated for other impairments, e.g., chest pain, anemia, but had recovered well and had no resulting ongoing limitations. (Id.) After summarizing in detail the medical records, including the records of Plaintiff's psychiatric treatment beginning in October 2010,

- 19 -

the ALJ found that her "statements concerning the intensity, persistence and limiting effects of [her] symptoms [were] not entirely credible prior to February 1, 2013." (Id. at 22-25.) The ALJ noted several inconsistencies in the record. (Id. at 25.) For instance, her daily activities were not what one would expect given her descriptions of her limitations and symptoms; the type of medical treatment she has received was also not what one would expect; her reported vague symptoms of pain generally resolved quickly; the symptoms of her mental impairments were well controlled by medication; and the mental status exams were generally normal and, when they were not, it was at times when Plaintiff was under great stress. (Id.) Also, there were no opinions from treating or examining physicians that Plaintiff was disabled or had limitations greater than those found and there were no restrictions from treating physicians. (Id.)

With her RFC, Plaintiff could perform her past relevant work as an office clerk prior to February 1, 2013, and was not disabled. (Id. at 26.) As of February 1, 2013, she was disabled. (Id.) The ALJ further held that, "even if [Plaintiff] were found to have severe mental impairments" and "was limited to work requiring the performance of only simple tasks with occasional interaction with supervisors and no interaction with the public," she could perform jobs that exist in the local and national economies. (Id.)

## Standards of Review

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or

be expected to result in death.  42 U.S.C. §§ 423(d)(1), 1382c(a)(3)(A).  Not only the

impairment, but the inability to work caused by the impairment must last, or be expected to

last, not less than twelve months.  **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002).

Additionally, the impairment suffered must be "of such severity that [the claimant] is not only

unable to do [her] previous work, but cannot, considering [her] age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national

economy, regardless of whether . . . a specific job vacancy exists for [her], or whether [s]he

would be hired if [s]he applied for work."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

"The Commissioner has established a five-step 'sequential evaluation process' for

determining whether an individual is disabled.'"  **Phillips v. Colvin**, 721 F.3d 623, 625 (8th

Cir. 2013) (quoting Cuthrell v. Astrue, 702 F.3d 1114, 1116 (8th Cir. 2013) (citing 20 C.F.R.

§§ 404.1520(a) and 416.920(a)[8]).  "Each step in the disability determination entails a separate

analysis and legal standard."  **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

First, the claimant cannot be presently engaged in "substantial gainful activity."  See 20

C.F.R. §§ 404.1520(b), 416.920(b); **Hurd**, 621 F.3d at 738.  Second, the claimant must have

a severe impairment.  See 20 C.F.R. §§ 404.1520(c), 416.920(c).  A "severe impairment" is

"any impairment or combination of impairments which significantly limits [claimant's]

physical or mental ability to do basic work activities . . . ."  Id.

---

[8]Unless otherwise indicated, all citations to the Code of Federal Regulations are to the
revision in effect at the time of the ALJ's decision.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Bowen v. City of New York**, 476 U.S. 467, 471 (1986); **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009). "[A]n RFC determination must be based on a claimant's ability 'to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **McCoy v. Astrue**, 648 F.3d 605, 617 (8th Cir. 2011) (quoting Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007)). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

"'Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3]

precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)).  "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'"  **Id.** (quoting Pearsall, 274 F.3d at 1218).  After considering the *Polaski* factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints.  **Ford v. Astrue**, 518 F.3d 979, 982 (8th Cir. 2008); **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e).  The burden at step four remains with the claimant to prove her RFC and establish she cannot return to her past relevant work.  **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).  See also 20 C.F.R. §§ 404.1520(f), 416.920(f).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting <u>Finch v. Astrue</u>, 547 F.3d 933, 935 (8th Cir. 2008)); <u>accord</u> **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting <u>Goff v. Barnhart</u>, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730.

## Discussion

Plaintiff argues that the ALJ erred by (1) not finding her to have a severe mental impairment at step two and (2) improperly evaluating her credibility.[9]

As noted above, Plaintiff has "the burden at step two of showing a severe impairment that significantly limit[s] her physical or mental ability to perform basic work activities, but

---

[9]Plaintiff also argues that the transcript is incomplete, specifically citing a missing death certificate, substitution of party, and entry of appearance. Of these three, the only relevant document to the question before the Court is the death certificate. It appears beyond dispute, however, that Plaintiff died of lymphoma-related causes.

the burden . . . is not great." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001). "If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two." **Kirby v. Astrue**, 500 F.3d 705, 707 (8th Cir. 2007). "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard." **Id.** at 708.

Citing **Buckner v. Astrue**, 646 F.3d 549, 557 (8th Cir. 2011), the Commissioner correctly notes that being diagnosed with a mental or emotional impairment does not mean that the impairment is severe. (Def.'s Br. at 6-7.) In **Buckner**, the court rejected the claimant's argument that the ALJ had erred by not finding his mental impairments to be severe. **Id.** at 556-57. A licensed psychologist had completed a Psychiatric Review Technique form, concluding that the claimant's depression and anxiety had not impaired his activities of daily living; had only mildly limited his ability to maintain social functioning and his ability to maintain concentration, persistence, and pace; and had not resulted in any episodes of decompensation. **Id.** at 553. The claimant did not challenge those conclusions or the ALJ's identical ones. **Id.** at 557. There was also evidence that the claimant "could effectively manage his depression and anxiety without medication or other assistance." **Id.**

In the instant case, however, Dr. DeVore found that Plaintiff had moderate difficulties in maintaining concentration, persistence or pace. "Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00(C). The regulations provide that a rating of "none" or "mild"

in the three functional areas of activities of daily living; social functioning; and concentration, persistence, or pace generally indicates that the impairment is not severe. 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1). Consequently, a rating of "moderate" implies that the impairment is severe.

When concluding that Plaintiff's mental impairment was not severe, the ALJ erroneously found that she had not had any psychiatric treatment. Correctly noting that the ALJ later summarized in detail Plaintiff's psychiatric treatment, the Commissioner argues that this is a mere deficiency in opinion writing. The Court is unconvinced. In the same discussion of whether Plaintiff's mental impairment was severe, the ALJ also erroneously held that the only mental limitation Plaintiff described at the hearing was fatigue. In addition to fatigue, Plaintiff testified about being depressed and anxious, having crying spells, and having trouble with her memory. The summarization was made in the context of assessing Plaintiff's credibility. The ALJ found the nature of her psychiatric treatment, e.g., hospitalizations triggered by specific situations and control of her symptoms of depression and anxiety by medication, to detract from that credibility. The ALJ included in her summary the reference in the notes of Plaintiff's November 2012 visit to Dr. Garcia-Ferrer that Plaintiff reported that she tended to be forgetful. The tendency was preexisting, but worsening. Eleven months earlier, Plaintiff had reported memory problems when being seen at the JFK Internal Medicine Clinic. The ALJ did not address Plaintiff's claim of memory loss, cited by her as a disabling impairment when applying for DIB and SSI. Also when applying, Plaintiff reported that she could not pay attention for longer than three minutes and that her impairments adversely

affected her memory and her abilities to concentrate and complete tasks. After the initial denial of her applications, she reported that her short-term memory was worse. She testified she has memory problems. The ALJ found the allegation of a three-minute attention span to be incompatible with her abilities to shop, play cards, watch movies, and drive a car. (R. at 20.) It was, however, compatible with her testimony that she has memory problems and had lost a cleaning job because of them. (See R. at 52.)

In **Page v. Astrue**, 84 F.3d 1040, 1043-44 (8th Cir. 2007), the court held that the ALJ had not erred by not finding the claimant's mental impairment to be severe at step two. The claimant had *not* alleged a mental impairment when applying for disability and had sought mental health treatment only for purposes of seeking disability. As noted above, Plaintiff alleged a mental impairment when applying and regularly sought treatment for such. The treatment included receiving counseling; however, the ALJ never cited such.

The significance of the ALJ's failure to address the severity of Plaintiff's memory problems is increased by the results of the February 2013 MRI of her brain. Memory loss or confusion may be symptoms of brain lesions. See Brain Lesions: Causes, Symptoms, Treatments, http://www.webmd.com/brain/brain-lesions-causes-symptoms-treatments (last visited Aug. 21, 2014). The ALJ did not develop the record as to whether the lesions on Plaintiff's brain could account for her consistent complaints of memory loss.

## Conclusion

Because the ALJ erred in not finding at step two that Plaintiff had a severe mental impairment, the case must be remanded. On remand, the ALJ should revisit the issue of

Plaintiff's credibility insofar as her adverse assessment of such was influenced by her disregard of Plaintiff's claims of memory loss. Although the Court is aware that the ALJ's decision as to non-disability may not change after properly considering all evidence of record and undergoing the required analysis, see **Pfitzer v. Apfel**, 169 F.3d 566, 569 (8th Cir. 1999), the determination is nevertheless one that the Commissioner must make in the first instance. Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is REVERSED and that this case is REMANDED to the Commissioner for further proceedings as discussed above.

An appropriate Order of Remand shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE


Dated this  22nd  day of August, 2014.